# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MICHELLE FOY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Case No. 2:11-CV-03672-KOB** |
| **PAT DONALSON AGENCY,** ) | |
| **NATIONWIDE MUTUAL** ) | |
| **INSURANCE COMPANY,** ) | |
| **AND PATRICIA DONALSON,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>MEMORANDUM OPINION</u>

This matter, involving allegations of race discrimination and violations of the Fair Labor

Standards Act as well as state law claims, is before the court on the following motions:

"Defendant Nationwide Mutual Insurance Company's Motion for Summary Judgment" (doc. 37);

"Defendants' Motion for Partial Summary Judgment" (doc. 40)  filed by the Pat Donalson

Agency and Patricia Donalson;  "Defendant Nationwide Mutual Insurance Company's Motion to

Strike Certain Evidentiary Submissions of Plaintiff and Other Evidence in Opposition to

Nationwide's Motion for Summary Judgment" (doc. 49); and "Defendants' Motion to Strike

Evidentiary Submissions in Support of Plaintiff's Opposition to Summary Judgment" filed by the

Pat Donalson Agency and Patricia Donalson (doc. 52). These motions have received thorough

briefing and are ready for resolution.

1

For the reasons stated in this Memorandum Opinion, the court FINDS that Nationwide's motion for summary judgment is due to be GRANTED in its entirety; and that the Donalson Defendants' motion for partial summary judgment is due to be GRANTED in part and DENIED in part.  Further, the court FINDS that the motions to strike are due to be GRANTED in part and DENIED in part.

## I.  MOTIONS TO STRIKE

The court will first address the motions to strike to determine what facts are properly before it for consideration on summary judgment.  Nationwide's motion to strike (doc. 49) requests that the court strike in their entirety the following documents: Plaintiff's Exhibit 1, the EEOC Charge of Deborah Mullen, Foy's former co-worker at the Pat Donalson Agency; Plaintiff's Exhibit 2,  the August 6, 2007 report of Christine Brown, another of Foy's former co-workers,  regarding an argument between Donalson and Mullen; statements of fact that rely on Exhibits 1 and 2; and further, portions of Plaintiff's Exhibit 4, the Declaration of Deborah Mullen, as well as statements of fact that rely on it.  The Donalson Defendants' motion to strike (doc. 52) requests that the court strike not only the exhibits and related statements of fact referenced in Nationwide's motion, but also Plaintiff's Exhibit 3, a letter from Michelle Foy to the Department of Labor dated August 16, 2011, and statements of fact that rely upon that exhibit.

 As to the objection to Foy's Exhibit 1, Deborah Mullen's EEOC Charge, the court DENIES the motions to strike.  Mullen's EEOC Charge is made under penalty of perjury, dated, based on personal knowledge, setting out facts most of which would be admissible in evidence, and concerning matters about which she would be competent to testify and relating to matters

relevant to the controversy before the court.  Accordingly, the court FINDS that Ms. Mullen's statement in Exhibit 1 meets the requirements of a declaration set forth in Rule 56(c) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56(c) & notes discussing the 2010 Amendments.  Having so found, however, the court notes that not every sentence in Mullen's EEOC Charge would necessarily be admissible in evidence, and the court will disregard the information that is not proper for consideration regarding these motions for summary judgment.

Defendants also request that Foy's Statement of Fact 12 be stricken, which is "supported" by a sentence in the EEOC Charge.  Although the court does not strike the EEOC Charge as a whole, the court GRANTS the request to strike that Statement of Fact, STRIKING that statement because the "facts" presented in that paragraph are opinions and opinions based on speculation and, thus, not proper factual evidence.

As to Foy's Exhibit 2, Christine Brown's report, the Donalson Defendants object to it as unsworn and unauthenticated.  The court notes that these exhibits are offered at the summary judgment stage, not at trial.  At the summary judgment stage, affidavits and declarations sufficient to support facts do not need to be sworn and notarized and need not necessarily be presented in a form that would be admissible in evidence; a proper objection is that they "*cannot be* presented in a form that would be admissible in evidence."  *See* Fed. R. Civ. P. 56 (c) (2) & (4) (emphasis added).  Examples of facts that could not be presented in an admissible form would be statements that were not made on personal knowledge or statements made by someone who was incompetent to testify about them.  Although declarations need not be sworn, they should state that the facts are true under penalty of perjury.  *See* notes to Fed. R. Civ. P. 56, 2010 Amendments.

3

Exhibit 2 sets forth many facts that Brown could present at trial because they are based on personal knowledge; she claims to have witnessed an argument between Donalson and a black fellow employee of the Agency.  The court FINDS that Brown's statement is due to be struck, however, because it is neither sworn nor expressly made under penalty of perjury.  The court notes, however, that Deborah Mullen's EEOC charge, which the court does not strike, discusses this same incident and bases her discussion on facts about which she has personal knowledge.  Although Mullen's Charge states that Brown was a witness to the incident, which supports part of Foy's fact #11, the court will strike the portion of Foy's fact #11 that refers to Brown's verification of the incident based on Exhibit 2, and will GRANT the motions to strike to the extent that they request that action.

As to Foy's Exhibit 3,  a letter from Michelle Foy to the Department of Labor dated August 16, 2011, the court acknowledges that, as a stand-alone exhibit,  it was neither a sworn statement nor made under penalty of perjury and is not authenticated.  However, the court notes that the letter was also Exhibit 25 to Foy's deposition, and she authenticated it in her sworn deposition testimony as the letter she sent to the EEOC, copying Szvoren, Nationwide's district manager.  (Doc. 65-1, at 53).  Therefore, the court sees no reason to strike an evidentiary document that is  properly authenticated elsewhere, and the court DENIES the Donalson Defendants' motion to the extent that it makes that request.  The court further acknowledges that some statements in the letter are either not made with personal knowledge, or the facts in the letter do not make clear whether they are made with personal knowledge.  At the summary judgment stage, when the court is the decision-maker, the court is capable of disregarding statements made without personal knowledge, and the entire exhibit need not be stricken when

4

parts of it are not subject to valid objections.  Therefore, the court DENIES the Donalson

Defendants' motion to strike as to this entire exhibit and to the "undisputed facts" supported by

this exhibit.

     As to Foy's Exhibit 4, the affidavit of Deborah Mullen, the court will GRANT the

motions to strike IN PART.  As noted above, the court generally does not grant motions to strike

affidavits at the summary judgment level where some of the information in the affidavit is

objectionable and most is not, recognizing that the court is capable of disregarding what should

be disregarded.  However, because many of the paragraphs in Mullen's affidavit are either

irrelevant or immaterial to the claims in this case or fail to provide enough information to

determine whether they are based on personal knowledge, the court will GRANT in part the

motion as to this affidavit.

     In paragraphs 3, 4, 10, and 12, for example, Mullen testifies about what Donalson said

but does not make clear whether Donalson said those statements to Mullen or in her presence, or

whether Donalson allegedly said them to a third party and  Mullen heard about the statements

from a third party. Further, the court sees no possible relevance of paragraphs 26-31dealing with

the alleged sexual conduct of Donalson's husband and related investigations.

     In other paragraphs, such as paragraphs 32 and 33, Mullen makes blanket statements

about what "Nationwide" refused to do, stating that "[f]or many years, Nationwide refused to

observe Martin Luther King, Jr. Day," and that "Nationwide still refuses to write policies in

many predominantly African American places. " However, Mullen provides no background or

explanation regarding those general statements about a national company with numerous offices

in the state of Alabama and all over the county, so the court cannot determine whether those statements are based on specific facts of which Mullen has personal knowledge.

Finally, the court finds that the information in paragraphs 24 and 25 of Mullen's affidavit is hearsay and otherwise not proper evidence; therefore, the court will GRANT the motions as to those paragraphs.

Therefore, the court will GRANT the motions to strike regarding Mullen's affidavit to this extent: it will STRIKE paragraphs 3, 4, 10, 12-14, 16-17, 19-22, and 24-33 of Mullen's affidavit.  The court also STRIKES the corresponding facts supported by those paragraphs of the affidavit: Plaintiff's facts 7, 8, 10, 11 (second part of sentence: "and verified that it took place"), 17-22, 41, 44, 45, 52, 63 (only strike reference to Brown), and 68-74.

However, paragraphs 1, 2, 5-9, 11, 15, 18, and 23 of the Mullen affidavit appear to be based on personal knowledge and are not otherwise objectionable; therefore, the court DENIES the motions as to those paragraphs.

## II.  FACTS

The court includes the relevant facts that have not been stricken.  For the purposes of summary judgment, the court views the remaining facts in the light most favorable to Plaintiff, the non-movant, although they may not be the facts proven at trial.  The claims at issue in these motions are race discrimination claims brought pursuant to § 1981 for pay discrimination, discriminatory discharge, and hostile work environment; retaliation under the FLSA; and the tort of outrage.

*The Agency Agreement between the Donalson Defendants and Nationwide*

Defendant Patricia Donalson, who is white, is the principal of Defendant Pat Donalson Agency (both Donalson and the Agency together are referred to as "the Donalson Defendants"),

an insurance agency that writes business on behalf of Defendant Nationwide Mutual Insurance

Company. A set of documents exists between the Agency and Nationwide referred to as an

"Agent's Agreement."  Donalson originally signed the Agent's Agreement on behalf of the

Agency using a January 1, 1987 date, but that Agent's Agreement now also includes subsequent

addenda and amendments.  That Agent's Agreement lists the Donalson Agency as agent and Foy

as associate agent/office staff and provides that the associate agent/office staff "will work solely

for agent."  The Agent's Agreement and the Donalson Defendants all characterize the Agency as

an independent contractor of Nationwide, and the Agreement states that the Agency is solely

responsible for paying all of its federal, state, and local taxes and for reporting on the payment of

such taxes.  However, because the insurance industry is closely regulated, Nationwide must

provide the Agency with supplies, materials, manuals, records and forms that would be necessary

for the Agency to conduct Nationwide-related business.

  The Agent's Agreement with Nationwide specifies that the Agency is responsible for its

own expenses, and may not incur indebtedness on behalf of Nationwide, although Nationwide

may offer training, counsel and guidance to the Agency; however, the Agency may reject such

offers.  The Agent's Agreement specifically states that the Agency has "the right to exercise

independent judgment" in carrying out the provisions of the Agent's Agreement.  When the

Agency hires an associate agent, Nationwide's only involvement is to determine, after the

associate agent is properly licensed to sell insurance, whether Nationwide will appoint that agent

to sell Nationwide products.  If the new agent at the Agency wishes to sell Nationwide products,

Nationwide requires her to sign an authorization consenting to credit checks, general background

checks, and criminal background checks, because the agent will handle policyholder premiums.

Nationwide will appoint any Agency employee who does not have a criminal background or bad credit.

The Agency, not Nationwide, supervises the on-the-job conduct of the Agency staff. Nationwide Sales Managers, such as Ron Szvoren, do not perform assessments of the conduct of Agency staff and have no day-to-day responsibilities about supervising Agency staff.  Szvoren never saw an associate agent's performance evaluation.

*Foy's Relationship with Nationwide and the Agency*

The Plaintiff, Michelle Foy, who is African American, began working with the Agency in March or April of 2003 as a trainee without pay. Foy understood  from statements Donalson made to her in or about December of 2003 that Foy was preparing to take over Donalson's business upon Donalson's retirement.  Donalson stated that she had no one to take over her business when she retired, that Donalson did not want another agent to take over her clientele; thus, training under Donalson would be a great opportunity for Foy.  Neither Donalson nor the Agency gave Foy a clear, written explanation of her duties while the Agency employed her.  Foy did not begin receiving pay from the Agency until September of 2004.

Associate Agent's Agreement

On October 28, 2003, Foy and Donalson both signed a document with an effective date of October 29, 2003 entitled "Agency Associate Agent/Office Staff Agreement (Independent Contractor Agent Only" ("Associate Agent's Agreement"), which purports to be an agreement between Nationwide, the Agency and Foy and is meant to define the relationship among those signees.  On November 7, 2003, a sales manager signed the document on behalf of Nationwide. Foy claims that both the Agency and Nationwide were her *joint* employers.  The Associate

Agent's Agreement provided that "no compensation will be paid to Associate Agent/Office Staff by [Nationwide]" and Nationwide did not handle payroll, insurance, taxes, or similar records for the Agency staff.

Nationwide did a background check on Foy about January of 2004, and Foy purchased a computer in February of 2004 and claims that she did so "strictly to do Nationwide's work" after receiving access to Nationwide software. (Foy dep. Ex. E, at 46).

Nationwide may invite Agency associate agents, such as Foy, to attend Nationwide's annual sales conferences, but if associate agents do so, the Agency is responsible to pay the associate agent's expenses, and regardless, the associate agent cannot attend unless the primary agent for the Agency also attends.

The Associate Agent Policy further explains that associate agents, like Foy, are either employees or independent contractors of the Agency, who are appointed by Nationwide. The Agency, not Nationwide, is responsible for obtaining errors-and-omissions insurance coverage for each associate agent. Nationwide and the Agency do not share health plans. The Agency, not Nationwide, determined whether associate agents, like Foy, were paid hourly on or a salary basis; determined whether they were part-time or full-time staff; determined whether they were entitled to overtime; determined the rate and the method of salary payment; determined the commission split between associate agents and their agencies; and determined Foy's work schedule, subject to the hours Foy herself chose to work. Foy acknowledges that, while she was an associate agent for the Agency, she did not keep track of the hours she worked and has no documents showing when she was not paid minimum wage or overtime wages by the Agency.

9

In some respects, Foy operated independently from the Agency. For example, she often worked from home; however, during the 2004-to-2006 time frame, Foy went by the Agency office for two-to-three hours at least three-to-four times a week, splitting work between home and office about fifty-fifty.  Although she claims that towards the end of her Agency employment, she was not allowed to work on Agency premises, Donalson disputes that claim and insists that Foy specifically requested to work at home.  Foy acknowledged in deposition testimony that Donalson's home, out of which the Agency members worked, did not provide an ideal work environment – calling it "uninhabitable" because it was not air conditioned in the summer and did not have heat in the winter – so employees other than Foy, including white employees such as Sandra Wright and Marcia Hill, often worked from home.  Foy paid for the fax line at her home that she used for Agency work; she paid for her own cell phone, even though she used her cell phone primarily for work calls; she paid for her own internet, computer and computer ink cartridges that she used for work; she paid for her own gas when she traveled for work and did not receive reimbursement for it; and she paid for the digital camera she used for work and was not reimbursed.  Further, she worked at second jobs intermittently while working for the Agency: H&R Block during tax season and Bolin-Reeves Florist during busy days around Valentine's Day and Mother's Day.

Foy's Contact with Nationwide

Although Foy often worked with Nationwide products, she wrote insurance policies other than Nationwide policies while working for the Agency.  When she could not write the coverage requested through Nationwide, she solicited products from other insurance companies through Insurance Intermediaries.  Foy also wrote policies on behalf of Foremost Insurance, and the

10

Agency paid her commissions on Foremost policies separately from her commissions on Nationwide policies.  Foy never received a performance evaluation from Nationwide.

Foy points out that when she tripped on a step at work, Nationwide paid her medical expenses for two years.   However, Donalson's testimony, while not entirely clear, seems to state that Nationwide paid Foy under a Nationwide insurance policy held by Donalson or the Agency to cover Donalson's property, and the record does *not* establish that Nationwide paid Foy worker's compensation benefits *as its employee*.

Foy attended some Nationwide training courses, which were provided at no cost to her, although the Agency may have paid her course costs; Foy did not pay her own expenses.

As far as a direct connection with Nationwide personnel, Foy recalls one conversation with Wayne Horton, who was Nationwide's former district manager, about training.  In approximately 2006, Foy also discussed with a Nationwide auditor  how she met Donalson and how she "started out working for her and [] wasn't being paid."  (Foy dep. at 185-86 - Ex. E (deposition sealed because of other confidential information)).

Foy met Nationwide's district manager, Ron Szvoren only one time, when he shook her hand at the end of a training meeting she attended; he held the district manager position during a good bit of her employment with the Agency.  She had no other personal interaction with Szvoren except that a record exists of four emails that she sent him following up on Nationwide customer service and further, on August 16, 2011, she sent him a copy of an EEOC charge she filed against the Agency *after* her termination in which she complained about discriminatory pay. None of the four emails mentioned alleged discrimination, misclassification, FLSA violations or

misconduct on the part of the Agency or Nationwide.  Szvoren never emailed Foy directly and never responded to her emails.

Foy used Nationwide software on her computer, had a Nationwide email address, and Nationwide performed a background check of Foy when the Agency formally hired her.  Foy testified that Donalson represented to Foy that Foy worked for Nationwide, and Foy understood that she was the employee of joint employers: Nationwide and the Agency.  Foy asserts that Nationwide maintained control over her and the Agency through background checks of Agency hires; emphasizing that Agency employees be licensed; retaining the authority to shut an agency down if a non-agent gave coverage without a license; providing training to Foy; keeping records of sales for agencies; mandating that Agency documents be scanned into its vault; mandating ethical policies for agents, such as Foy, to follow; auditing the Agency; operating a client management list for leads that agents, such as Foy, followed; providing sales reports to agencies, such as the Donalson Agency; setting geographical boundaries on the policies Foy wrote (Alabama only); providing letterhead and envelopes with Nationwide insignia; and demanding that titles be kept at the Agency level.

To show Nationwide's control over Agency employees, Foy testified that Nationwide had required Donalson to terminate Agency employee Lauren Whigby, but Whigby was fired before Foy began working for the Agency, and Foy had no personal knowledge about her firing.  The only support for Nationwide's involvement in Whigby's firing was Foy's own *hearsay* testimony about what Donalson had allegedly told Foy regarding Nationwide's role, not testimony by Donalson or someone else with *personal knowledge* about the firing, such as a Nationwide representative or Whigby.

12

*Number of African American Agents In Nationwide's District #14 or Alabama*

Although the Complaint asserts that Nationwide only employs two African American agents in this region out of a total of 35-40 agents, Foy testified in her deposition that she did not know the number of African American agents in Nationwide's District #14, where the Donalson Defendants are located, nor does she know the total number of agents in that district. Donalson testified that she knew of two strong African American Nationwide agents in Birmingham, but acknowledged that she "did not run in that circle," could not testify about new hires, and could not accurately state the number of African American agents that worked for Nationwide in Alabama. Thus, Donalson did not testify specifically about the total number of African American Nationwide agents in the district and said she did not know what percentage of African American agents versus white agents worked for Nationwide locally. Therefore, neither Foy nor the Donalson Defendants presented evidence based on personal knowledge as to the number of African American agents in Nationwide's District #14. Further, Nationwide has presented evidence that, in district 14, it does not directly employ agents, but instead, employs only independent contractors, such as the Agency. Consequently, it does not maintain records regarding the race of the agents and associate agents that its independent contractors employ. Accordingly, no evidence properly presented to the court establishes the number of Nationwide's African American agents in district 14 and the percentage of African American agents compared to white agents in that district.

*Alleged Disparate Pay*

Beginning in September of 2004, the Agency paid Foy $13 per hour, and in 2007, changed her pay structure to a partial commission basis with base pay of $13 per hour for 15

hours per week plus 80 percent commission on new policies and 40 percent commission on renewals, which she claims averaged just over $13 per hour worked.  However, even after the 2007 change in pay structure, Foy continued to work full-time, five days a week.  Other African American employees were also paid at a low rate: the Agency paid Anna Rice and Deborah Mullen only $10 per hour.

In comparison to the pay structure of Foy, Rice and Mullen, Foy points to the Agency's higher pay structure for white employees Sandra Wright, Stacie Harris, and Marcia Hill.  The Agency paid Sandra Wright $18 per hour for part-time work, which the Donalson Defendants claim was based on Donalson's understanding that Wright had a master's degree and had experience as a Nationwide agent before becoming an Agency employee.  However, in Donalson's deposition testimony, in response to the question about whether she looks for a certain level of education in job applicants, she responded: "I really haven't put – set– it just happens that the people I've hired all have a high school education."  (Donalson dep. 25).

The Agency paid Marcia Hill, who had thirty years of background in business and experience as an office manager, $20 - $22 per hour in the office manager position. In her deposition testimony, however, Donalson characterized Hill as holding the same position as Foy held: associate agent.  According to Foy, Foy and Hill were both hired initially at the Agency to function as Agency office managers, and Donalson paid for both Hill and Foy to go to licensing school.  The Agency paid Stacie Harris $18 per hour even though she was not a licensed agent, and the record is not entirely clear about the extent of her duties.

*Alleged Racial Statements*

Foy claims that she heard Donalson make the following statements, which she characterized as racial:   (1) Donalson stated that Nationwide would never hire Foy because she had a child born out of wedlock; (2) Donalson stated that she did not want "those riffraff" coming to her home office to make payments in person, referring to Donalson's urban clients, and when Foy asked Donalson whether by "riffraff" Donalson specifically meant African Americans, Donalson remained silent and did not deny that interpretation; (3) When Foy asked Donalson if her sons were coming home for the holidays, Donalson replied, "No, that's something you all do. [My sons] are hardworking."  Foy understood that "you all" meant African Americans.  Donalson explains, however, that the comment about her sons being hard working was instead a specific response to three employees requesting to take off most of the month of December.

*Physical Assault*

Foy alleges that Donalson hit her on two occasions.  The first occurred in 2007 when Foy's pay was changed to a partial commission basis. According to Foy, when Foy refused to sign a document evidencing this change because she did not agree to it, Donalson struck her three times on her arm in front of Agency employees Deborah Mullen and Christine "Tina" Brown. Foy explains the argument leading up to the physical contact as follows:

> In 2007 that was when she had switched my – switched my pay, and I told her I refused to sign the papers and, you know, she was over talking to me and I was over talking to her and it was the same situation you know, listen, listen, listen, and she just started, that's when she started pounding on me.

(Foy dep. at 110 - Nationwide's Ex. E).   As a result of this incident, Foy went to American

Family Care, but did not file a police report.

The second incident occurred on or about July 11, 2011 when Foy again confronted

Donalson about unpaid wages and made a remark about Donalson being famous for not paying

people.  Foy recounts the incident in her deposition testimony:

> A. I went over to Pat and I said, Pat, quit making all these excuses, what she
> is famous for, one excuse after another, I want my pay.  She said you said you
> wanted to be put through payroll and so I'm going through payroll.  I said we
> just had a payroll, so where is my pay, why didn't I get it on this payroll.
> Well, they're going to have to do it on the next payroll.  I said you're going to
> be behind again so that's going to throw my pay off.  She said, well, look,
> you either want – now – either you want it through payroll or you don't.  I
> said, Pat, I want it through payroll, I said, because you should be paying into
> my Social Security and Medicare, you know, and then – she then she said it
> will be paid.
>> I said, Pat, you can call payroll right now and have them to cut me a
> check. I said that's just a bunch of excuses and then so she started saying
> about when Nationwide deposits – I said I don't have nothing to do with
> when Nation – because they deposited their money three or four times.  So,
> then, I would start telling her how she was famous for not paying her bills ....
> So that just probably added to the situation.
> Q. Did she respond to that in any way?
> A. Yeah, by hitting me.

(Foy dep. at 115-117 - Nationwide's Ex. E).  Then, Donalson struck Foy once on her left arm in

front of Tina Brown.  Foy consulted a doctor after this incident, seeing him two or three times

total.   She also filed a police report about a month after the incident, on August 12, 2011.

According to Foy, Donalson also verbally assaulted her on occasion.

According to Agency employee Mullen, who is African American, Donalson also

grabbed her on one occasion resulting in Mullen's filing a police report.  On that occasion,

according to Mullen's EEOC report, the argument between Mullen and Donalson related to

vacation time and Mullen's side job:

> I told [Donalson] that I still was entitled to paid vacation and she said that I was not going to get it that I was part time and I work a little side job at home and I told her when I type at home has nothing to do with her.  As she yelled, I told her she still was not fair, and that's when she lost control and grabbed my right forearm and held it tight and told me to shut up and I needed to leave.

(Pl's Ex. 1, at 3).

### Requests to be Paid through Payroll, Paid for Hours Worked and Paid Timely

In 2008, Foy requested that Donalson pay all of her wages through payroll to ensure that she was paid in a timely manner, and also  that Donalson would pay into Social Security and Medicare on her behalf.  Although the record is not very clear, Foy's testimony indicates that, for a period of time, Donalson paid at least part of Foy's salary with Donalson's personal checks.  Foy wanted to be paid "through payroll," which seemed to be an outside service that would send wages to employees on behalf of the Donalson Defendants.   At one point, Donalson was paying through payroll Foy's hourly salary  but not the commission part of her salary.  According to Foy, Donalson did not give Foy that option of paying commissions through payroll until the last month or so of her tenure with the Agency.  Donalson was often behind in paying Foy her salary and commissions, and on at least one occasion was as much as three months behind.

Donalson had control over Foy and required her to do things like attend meetings; required her to be accessible at all times by phone; discouraged her from writing policies with companies other than Nationwide; and forbid her to write certain policies, such as policies in Ohio where Foy's family lived, broker policies, and Foremost insurance policies.  When Foy attempted to write Foremost policies, Donalson refused to pay her commissions off those policies.  Donalson also told Foy that Foy could not have a license that Donalson did not share, so she wanted Foy to limit her business to Alabama.

17

On July 9, 2009, after Foy discovered that Donalson was paying Marcia Hill more than her, Foy requested through email that she be paid a salary increase of five additional dollars per hour or receive an increase in the number of hours for which she was paid a salary from fifteen to twenty hours per week.  Foy had two conversations with Donalson about this request, but Foy does not recall the exact content of those conversations. On July 19, 2010, she advised Donalson through email that she did not believe her pay structure accurately reflected her work hours and that she was forwarding this email complaint to a labor attorney.  Instead of being paid $195.00 but getting credit for working only fifteen hours per week when she actually worked thirty-five to forty hours per week, she stated she would like the work records to reflect that she was only being paid six dollars per hour for thirty-five hours per week.   Once again, she and Donalson had verbal follow-up discussions about this request, but Foy does not recall exactly what Donalson said in those conversations.

*Termination*

On August 4, 2011, the Agency terminated Foy by letter.  When Donalson was asked in her deposition whether she asked for Ron Szvoren's advice before she terminated Foy, Donalson originally testified that she would have discussed the termination with him because she would have discussed any Agency problems with him.  Then, immediately after that statement, upon further reflection, Donalson stated that she doubted she asked his permission to terminate Foy and thought Szvoren had already moved to North Carolina by that time.  If he were still in his sales manager position over her Agency, she would have sent him a copy of the letter terminating Foy but would not have sent him a draft of the letter before terminating Foy.  Donalson testified that she would not have needed to contact Szvoren *before* terminating Foy because her personnel

decisions regarding discipline or termination of Agency workers was  Donalson's business and "not their [Nationwide's] responsibility." (Donalson dep. 121-22, Ex. D).

Foy claims that the termination was the result of her race as well as retaliation after her request to be paid through payroll to ensure prompt payment and Social Security and Medicare withholdings.  In a letter dated June of 2011 and in the email exchange with Donalson that followed, Foy had accused Donalson of not paying her through payroll to avoid dealing with Social Security and Medicare withholdings.  For her last three paychecks, Foy's wages – including, for the first time, her commission wages – were paid through payroll, and the Agency then terminated her.

About the time of her termination, Donalson allegedly told Foy that Szvoren of Nationwide had recommended that she be terminated because she was "stealing" Donalson's policies.  Although Foy's testimony is not entirely clear, apparently the controversy arose either because certain Nationwide policyholders whose policies were written by Foy were unhappy with service, or because Donalson referred policyholders to Foy, and Foy wrote them under her own number instead of under Donalson's number.  According to Foy, Donalson and other Agency employees referred clients to Foy to write or re-write policies.  On occasion, Donalson wanted Foy to write some of those policies under Donalson's letterhead and Donalson's agent number. Through Nationwide's training, Foy had learned that it was not ethical to write or re-write a policy under another agent's number; taking as an example a homeowner's policy, the agent viewing the property and devising square footage of the structure to be insured should prepare the policy under her name and agent number, in effect standing behind that information as true and correct. Therefore, before Foy was licensed and trained, she would write policies under

Donalson's name and number, but eventually, because of ethical considerations and because she did not want to use her gas and time to write a policy without getting credit under her own name, Foy stopped writing policies under Donalson's name and number and would only write or re-write them under her own.

The Agency disagrees that race or FLSA protected activity motivated Foy's termination, giving the following reasons for her termination[1]: (1) the Agency was in financial peril because of a series of business losses, so it needed to find ways to cut expenditures; (2) Foy was not effective in generating new business for the Agency or in servicing Agency accounts; and (3) Donalson understood that Foy had improperly changed policies to provide herself with higher commission rates.  Although Foy claims that the Agency filled her position with a white woman, she has provided no proper *evidence* to counter the Donalson Defendants' evidence that the Agency did not fill the position for some time.

### III.  STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether

---

[1] The court does not quote the language of the termination letter because the parties have not pointed the court to its location.  The Donalson Defendants' statement of fact #10 refers the court to a termination letter dated August 4, 2011 but instead of quoting the letter to explain its contents *or* referring the court to the termination letter's evidentiary exhibit number, they instead quote the responses to interrogatories regarding the termination, which response stated that the termination letter "will be produced herewith." (Doc. 41, at 7; Doc. 42, Ex. 4).

any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id*. at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)); *see also* Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e), 28 U.S.C. app. ("The very mission of summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.").  "The non-moving party need not present evidence in a form admissible at trial; however, he may not merely rest on his pleadings."  *Graham v. State Farm Mut. Ins.* Co., 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Celotex,* 477 U.S. at 324).  If he does, or if the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988).  The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment,

the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

## IV.  DISCUSSION

Foy brings two federal claims: a claim of race discrimination brought pursuant to § 1981 against the Agency and Nationwide; and a claim of retaliation in violation of the Fair Labor Standards Act against the Agency and Nationwide.  Further, she brings three state law claims against both Donalson Defendants: assault, battery, and outrage.

Initially, the court must comment that Foy has made the jobs not only of Defendants but also of this court much more difficult by throwing all the facts together in sixty-one paragraphs in the preliminary fact section of the Complaint, then listing, without further explanation, various causes of action.  She simply states rather unhelpfully "[t]he foregoing paragraphs are included herein as though fully set forth herein."  (Doc. 1, at 9 ¶¶ 69-73).  Apparently, Foy expects the Defendants and this court to connect the dots and figure out which facts fall within which causes of actions, often a painstaking and frustrating process.  While incorporating by reference previous paragraphs is a perfectly acceptable practice when employed precisely, the preferred method

23

would be to refer only to relevant paragraph numbers under each cause of action instead of incorporating indiscriminately the whole shebang.  Further, she should have provided some short, plain, and direct explanation of how those facts established the elements of her *prima facie* case for each cause of action.  In light of this sloppiness, if the Defendants had filed a motion requesting a more definite statement, the court would have granted that request, but they did not.

At the current summary judgment stage, the court has the benefit of evidence and briefs to flesh out the lack of clarity in the Complaint, and the court would expect that, given the lack of clarity in the Complaint, Foy would make an extra effort in her brief to clear up the muddiness in her pleading by setting forth the elements of her *prima facie* case and explaining how she has presented facts establishing each element.  She does not always do so.  The court is left to judicial dot-connecting, which is not a game judges like to play or should be called on to play, and Foy's counsel would do well to try to avoid initiating that exercise in the future.

### A.  The Joint Employer Issue

Because the § 1981 claim asserting *employment* discrimination and the FLSA claim can only be brought against Foy's employer(s), the court must first determine, as a threshold matter, which Defendant or Defendants, if any, functioned as her employer within the meaning of that statute.  Foy asserts that Nationwide and the Agency served jointly as her employers and are both subject to claims under § 1981 and the FLSA.  The Agency does not dispute that it had an employment relationship with Foy.  Nationwide, on the other hand, hotly disputes any such relationship; it argues that Foy is not a Nationwide employee but that she worked for the Agency, itself an independent contractor of Nationwide.

24

In determining whether an entity is a "joint employer," the Eleventh Circuit has interpreted the term "employer" liberally. *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). It iterated with approval the test stated in *National Labor Relations Board v. Browning-Ferris Inds.*, 691 F.2d 1117 (3rd. Cir. 1982): "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *McKenzie*, 834 F.2d at 933 (summarizing the *NLRB* test).

The basis for finding that two or more entities are joint employers "is simply that one employer while contracting in good faith with an otherwise independent company has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer" so that even though the two employers are in fact separate entities, "they share or co-determine those matters governing the essential terms and conditions of employment." *Virgo v. Riviera Beach Assoc., Ltd.,* 30 F.3d 1350, 1360 (11th Cir. 1994). Whether the entity alleged to be a joint employer has retained sufficient control is "essentially a factual question," and whether the resolution of that issue is for the court or for the jury depends upon whether genuine issues of material fact exist as to the exercise or retention of control. *Id.*

In the instant case, Foy points to the following facts as evidence of Nationwide's control over the terms and conditions of Foy's employment: (1) Nationwide performed a background check on Foy in approximately January of 2004[2] (however, the court notes that this background check occurred shortly after she applied to be a Nationwide agent but not when she first began volunteering at the Agency in 2003 or when the Agency began paying her in September of 2004);

---

[2] However, the court notes that this background check occurred shortly after she applied to be a Nationwide agent but not when she first began volunteering at the Agency in 2003 or when the Agency began paying her in September of 2004.

(2) Foy used Nationwide software on her computer; (3) Donalson informed Foy that Nationwide wanted her to be a Nationwide salesperson;  (4) Foy did not sign a separate employment agreement with either or both of the Donalson Defendants – the only written employment agreement was the three-party Associate Agent's Agreement with Nationwide and the Agency; (5) Foy testified that when she started working for Donalson, Donalson always spoke of Nationwide as the company she worked for, and Foy assumed that she was hired by Donalson to work for Nationwide as well; (6) Nationwide retained authority to shut the Agency down if an employee of the Agency who was not a licensed agent/associate agent for Nationwide wrote policies; (7) Nationwide provided training to Foy; (8) Nationwide kept records of sales for agencies, including the Donalson Agency; and (9) Nationwide mandates that Agency documents be scanned into its vault.

Nationwide, on the other hand, argues that Nationwide and the Agency are separate and distinct entities, having different tax identification numbers, filing separate tax returns, and having separate bank accounts and health plans.  The standards that Nationwide imposes upon its independent contractor agencies and the training it offers to those selling policies are a reflection of the highly regulated nature of the insurance industry, not proof of unified operations. Nationwide also points out that the Agency agreement and the Associate Agent's Agreement characterize the Agency as an independent contractor and specifically state that the associate agents work solely for the Agency.  Further, the evidence reflects that Nationwide does not decide whether associate agents such as Foy were paid hourly wages or a salary; does not conduct performance evaluations of Agency staff; does not handle payroll, insurance, or taxes for Agency staff; does not maintain employment records for the Agency staff; and does not own or

lease or have any investment in Agency equipment or facilities. Finally, Nationwide refers the court to evidence that Foy wrote insurance policies for companies other than Nationwide.

The court agrees with Nationwide. The evidence does not establish that Nationwide was Foy's employer nor does it establish that Nationwide jointly employed her along with the Agency. The Agency Agreement and Associate Agent's Agreement both contain language characterizing the Agency as an independent contractor of Nationwide and its staff as working solely for the Agency. The evidence provided to this court does not materially contradict that characterization. Applying the *NLRB* test, the court finds that Donalson and not Nationwide was in charge of managing and paying Agency staff and operating the Agency. It further finds that Nationwide did not control Agency personnel in any way that was inconsistent with an independent contractor relationship. Rather, the evidence reflects that Nationwide had no involvement in traditional employer tasks, and that Foy sold insurance policies other than Nationwide policies and had little direct contact with Nationwide personnel. Indeed, if courts accepted the argument that Foy proffers – that activities such as requiring appropriate licensing and providing training and software and stationary conferred employer status upon an insurance company such as Nationwide –  then no independent contractor insurance agencies would exist but all would be considered as employees. Such a result would discourage instead of encourage companies like Nationwide from training people who sell its products and from enforcing licensing requirements and standards. For all of these reasons, the court rejects Foy's argument that Nationwide was a joint employer.

Having so ruled, the federal claims against Nationwide for *employment* discrimination brought pursuant to § 1981 must fail, and also claims brought pursuant to the FLSA must fail; as

stated previously, these claims require an employer-employee relationship.  *See* 29 U.S.C. §§ 203(e)(1) & 203(g) defining the terms "employee" and "employer"; *see also Perdomo v. Ask 4 Realty & Mgmt.*, 298 F. App'x 820 (11th Cir. 2008) (per curiam) (affirming the grant of summary judgment against the plaintiff because he was an independent contractor and not an "employee" as defined by the FLSA, and thus, he had no right to sue under its overtime or wage provisions).  Thus, the court FINDS that summary judgment is due to be granted in favor of Nationwide and against Foy as to those claims.

### B.  Claim against Nationwide Asserting Discrimination Based on Contract

The remaining claim against Nationwide is the discrimination claim brought pursuant to §1981 based upon Nationwide's *contractual* relationship with Foy, as opposed to a specific *employment* relationship.

To establish a *prima facie* case of non-employment discrimination brought pursuant to §1981 sufficient to withstand a motion for summary judgment, a plaintiff must provide evidence that "(1) he [] is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (in this case, the making and enforcing of a contract)."  *Rustein v. Avis Rent-a-Car Sys., Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000). The critical element is the second one.  *Id.*  Any claim brought pursuant to § 1981 requires proof of purposeful discrimination.  *Id.*

Foy claims that the following evidence establishes Nationwide's liability for discrimination: (1) On August 16, 2011, *after* the Donalson Defendants terminated her, Foy wrote a letter to the EEOC complaining, among other matters, that the Donalson Defendants discriminated against her and other black employees by paying them less than comparable white

employees.  Foy claims that she sent a copy of this letter to Szvoren at Nationwide, but that Nationwide did not respond to the complaint or take any follow-up action; (2) Foy complained to a manager at Nationwide that she "needed some help as far as, you know, being trained," but she does not specify that her complaints had anything to do with discrimination (Foy dep. 184-5); (3) Foy told one of the Nationwide auditors in 2006 and some of the agents at a Birmingham agent's meeting the story of how she met Donalson and began volunteering at the Agency without pay when Donalson lost her office manager; Foy does not specify whether she characterized her treatment as discriminatory or otherwise advised them that Donalson discriminated against her because of her race.

The court makes no finding whether notifying Nationwide of alleged discrimination would render it liable for discrimination by failing to respond.  The court need not make such a finding because no evidence exists that Nationwide received notification *prior to Foy's termination* of the Donalson Defendants' *discriminatory* conduct against her based on race.   No evidence exists that Nationwide management personnel intended to discriminate against Foy based on race in the making or enforcing of the contract with her *and* no evidence exists that Nationwide received notice prior to Foy's termination that any one working for or alongside Nationwide committed discriminatory acts against Foy concerning the making or enforcing of the contract with her based on race.  The absence of evidence of purposeful discrimination requires the court to FIND that Foy has failed to establish her *prima facie* case against Nationwide as to the non-employment claim.  That claim against Nationwide must also fail as a matter of law, and the motion for summary judgment is due to be GRANTED as to the contract-based discrimination claim against Nationwide.

29

The court will ENTER SUMMARY JUDGMENT in favor of Nationwide as to all claims and DISMISS it as a party Defendant.

### C.  Claims against the Donalson Defendants

Foy asserts against the Donalson Defendants federal claims of race discrimination and violations of the FLSA.  She also asserts three state law claims, one of which alleges that the Donalson Defendants committed the tort of outrage. However, the Donalson Defendants' motion for partial summary judgment only addresses the federal claims and the outrage claim, so the court does not address the remaining state law claims.

### 1.  Race Discrimination Pursuant to § 1981

Foy identifies three grounds for her race discrimination claim: (a) unequal pay based on race; (b) termination based on race; and (c) harassment, such as physical assault and insults, based on race.

#### a.  Unequal Pay Based on Race

In the instant case, Foy has presented no direct evidence of racial discrimination.  To establish a *prima facie* case of disparate treatment in a race discrimination case based on circumstantial evidence, the plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse action; and (4) she was treated less favorably than a similarly situated individual outside her protected class.  *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.,* 342 F.3d 1281, 1289 (11th Cir. 2003).   In the instant case, the Donalson Defendants challenge the fourth element.  A plaintiff establishes the fourth element in an equal pay context "by showing that she occupies a job similar to that of

30

higher paid" persons who are not members of her protected class.  *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).

The Donalson Defendants argue that, as a full time Associate Agent, Foy had job responsibilities and functions that differed from every other employee at the Agency, and thus, no other employee could be similarly situated to her. Foy disagrees.  She acknowledges that she was planning on taking over the Agency when Donalson retired and took on duties and responsibilities second only to Donalson; however, she insists that the existence of those *greater* duties and responsibilities does not mean that the Donalson Defendants could pay white employees with *less* duties and responsibilities *more* than they paid Foy.

One of the identified higher-paid white comparators is Marcia Hill.  In her deposition, Donalson characterized Hill as an associate, the same title Foy held.  Hill received  $20-$22 per hour in contrast to Foy's $13 per hour, and did not write policies as Foy did.  Other evidence shows that Hill held the office manager position for the Donalson Defendants, but evidence also reflects that Foy also served as office manager at the lower rate of $13 per hour.  While Defendants attempt to dismiss Hill as a comparator, in part because she did *not* work on a commission basis and Foy did, this attempt ignores Foy's testimony that she did not want to work on a commission basis, objected to that change in the means of compensation,  and felt that she would be more fairly compensated for office manager duties on a salary basis.  Given that Donalson allowed Hill, a white employee, to be paid on a straight-salary basis but refused that same arrangement when Foy, a black employee, requested it, the Donalson Defendants may not now fairly point to that difference at the summary judgment stage as evidence that the two employees are not similarly situated. At the very least, Foy raises genuine issues of material fact,

that, if viewed in the light most favorable to Foy, could establish that Foy was similarly situated to Hill.

Another white comparator is Sandra Wright, who worked only part-time and had no agent's license and yet was paid $18 per hour compared to Foy's $13 per hour.

Further, the Donalson Defendants point to the wide range of tasks that Foy performed and the more limited range of tasks that Wright and Hill performed to support their argument that the position Foy held was not similarly situated to those of Wright and Hill.  However, the wide range of Foy's tasks, when viewed in the light most favorable to her, again supports her argument that her pay rate was discriminatorily low because she performed the same general tasks as the white employees *plus* additional tasks, and yet received pay at a lower rate.

In addition, the Donalson Defendants argue that Foy had differing levels of education and experience from Hill and Wright that prevent them from being "similarly situated" to Foy. However, Donalson's testimony does not establish that the payment discrepancy was based on differing levels of education and experience.

In sum, the court finds that genuine issues of material fact exist as to the discrepancy between Foy's pay and that of white employees, and that summary judgment is inappropriate as to this claim.  Therefore, the court will DENY the motion for summary judgment as to the claim for disparate pay based on race asserted against the Pat Donalson Agency; Foy asserts the race discrimination claims against only the Agency but not against Pat Donalson herself.

### B.  Discriminatory Termination

Foy does not present *direct* evidence of discrimination based on race.  To establish a *prima facie* case of discriminatory discharge by *circumstantial* evidence, a plaintiff shows that

"(1) [she] belongs to a racial minority; (2) [she] was subjected to adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (5) [she] was qualified to do the job." *Holified v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The parties do not dispute that Foy was African American, that she was fired, and that she was qualified to do the job, so the disagreement hinges upon the third element of whether the Donalson Defendants treated similarly situated white employees differently; in other words, "'whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (quoting *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998)).

To determine whether the termination was based on race, the court would normally turn initially to the termination letter, but the parties have not pointed the court to its location in the voluminous evidentiary material, and, although the court has diligently searched, it cannot find it. In their statement of fact number 10, the Donalson Defendants point to their interrogatory answers as providing the reason for the termination, and the answer to interrogatory 7 says:

> Predominantly, the Plaintiff was terminated because the Agency endured a series of business losses which put the Agency's finances in peril. At that time, the Plaintiff was not effective in assisting the Agency with adding new business, nor was she effective at assisting with servicing existing accounts. In addition, there were problems with the Plaintiff improperly changing policies to attain higher commission rates. These factors are all laid out in her termination letter of August 4, 2011 which will be produced herewith.

(Doc. 41, at 7).

Foy disputes in part this fact, explaining: "Plaintiff contended that she was assaulted and terminated because of race and in retaliation for making complaints about misclassification."

33

(Doc. 47, at 3, ¶ 10).  However, Foy, in disputing this fact, does not present any similarly-situated white comparators who were treated more favorably.

Another means of establishing a *prima facie* case would include the presentation of evidence that Foy had been replaced by a white employee.  Although Foy claims to have presented such evidence, she has not properly done so.  She has attempted through Mullen's affidavit to present hearsay evidence regarding Foy being replaced by a white employee, which evidence this court struck.  The Defendants properly presented other evidence providing that the Donalson Defendants had *not* hired a replacement for Foy.

For all of these reasons, Foy has not established her *prima facie* case on the discriminatory discharge claim, and the Donalson Defendants' motion for summary judgment is due to be GRANTED as to this claim.

### C.  Hostile Work Environment

To establish a *prima facie* case of racial discrimination based on a hostile work environment through circumstantial evidence, a plaintiff must show:

> (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee. . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).  The fourth element contains both an objective and subjective component, so the behavior in question "must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment

that the victim 'subjectively perceive[s] ... to be abusive.'" *Id.* at 1276 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993).

To evaluate the environment's objective severity, the court considers the following factors, among others:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

*Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir. 1997). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient to "amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal quotations and citations omitted). The Supreme Court established these standards to ensure that plaintiffs did not brandish civil rights statutes as a "general civility code" and also to "filter out complaints attacking the ordinary tribulations of the workplace." *Id.*

With that guidance in mind, the court looks at the evidence of harassment presented in the instant case. Foy claims that she was harassed because she was not allowed to work on agency premises, but her deposition testimony establishes that she *did* work on premises at times, that other black employees worked on Agency premises, that the Agency premises were often uncomfortable and other employees chose to work elsewhere,  and also that *white* employees worked off premises. Thus, the court finds that Foy has failed to support that aspect of her claim.

Foy also claims that Donalson made false and scurrilous remarks about her. To the extent that these claims involve Donalson's alleged statements about Foy's stealing her clients, Foy has shown no racial connection. To the extent that Foy refers to Donalson's alleged statements about Foy's having a child out of wedlock and Nationwide not hiring her because of that or "you all" –

whoever that term referenced – taking off for the holidays, those statements do not necessarily have any racial content and the court will not assume one. Other statements, such as complaining about "riff raff" could apply just as well to socio-economic background, but if Donalson did mean to refer to blacks, such a remark, while offensive, is not severe and pervasive so as to alter the terms and conditions of employment, even when added to the other remarks.

Further evidence offered as harassment focuses on Donalson's physical "assault/battery" against Foy on two occasions. No employee should endure hitting or grabbing. To convert the inappropriate conduct into the basis for a hostile work environment claim of discrimination, however, Foy must demonstrate some link between the harassment and her protected characteristic, here, her race. But, Foy's testimony states that the argument when Donalson supposedly hit her focused on pay issues. The first time Donalson hit her was in 2007 when Donalson changed her pay schedule to part-salary and part-commission and Foy refused to sign the paper agreeing to the change. The second incident occurred when Foy complained about Donalson's three-month delay in paying Foy and failure to pay her through payroll. Donalson hit an African American co-worker, Mullen, when Mullen asserted her right to paid vacation time and to work a side job at home.

None of these hitting incidents was accompanied by racial comments nor did Foy and Mullen specifically complain to Donalson at the time of the incident that the pay issues were based on race. Foy acknowledges that the connection between the hitting incidents and race is not a direct one. Instead, Foy's argument is that because the pay inequities were based on race and because Foy and Mullen complained to Donalson about their pay, even if they did not specifically complain of pay discrimination based on race, then the physical abuse resulting from

the complaints about pay must also be based on race.  She does not explain how Donalson's

reaction to her complaint about *delay* in payment or *method* of payment (payroll versus non-

payroll) could be based on race.

Further, Foy relies on many bits of evidence that is improper opinion, speculation, based

on lack of personal knowledge, or hearsay, "evidence" that this court struck.

Evaluating the evidence that remains after the granting in part of the motions to strike, the

court finds that this evidence – assuming *arguendo,* that it, or any part of it, might indeed raise a

question of racial motivation –  was not sufficiently severe or pervasive to alter the terms and

conditions of employment and create a discriminatorily abusive working environment *based on*

*race*.  Therefore, the court finds that the motion for summary judgment is due to be GRANTED

on this claim; the court will ENTER SUMMARY JUDGMENT in favor of the Pat Donalson

Agency and against Foy on the claim of a racially hostile work environment; the race

discrimination claim is asserted against the Agency but not against Pat Donalson herself.

### 2. FLSA

In her second cause of action, Foy asserts an FLSA violation.  The Donalson Defendants'

brief addressed two FLSA issues: (1) whether the Agency violated the FLSA in failing to pay Foy

wages that complied with the FLSA provisions; and (2) whether the Agency violated the FLSA

in retaliating against Foy for her protected activity under the FLSA.   Because of the lack of

clarity of the Complaint and its FLSA cause of action, the Defendants were perhaps not

completely sure that the Complaint attempted to state a claim for anything other than FLSA

retaliation. In any event, they addressed both issues, but Foy's response brief only addressed the

second issue of retaliation.  To the extent, if any, that the Complaint stated a claim for the first

issue, Foy abandoned that claim when she failed to address in her response the argument on that

claim set out in the Defendants' initial brief.  *See, e.g., Coal. for the Abolition of Marijuana*

*Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue

this issue during the proceedings before the district court is grounds for finding that the issue has

been abandoned"); *Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 13808, 1388 (11th Cir. 1997)

(noting that "'the onus is upon the parties to formulate arguments; grounds alleged in the

complaint but not relied upon in summary judgment are deemed abandoned'") (citation omitted),

*reh'g granted and vacated by* 136 F.3d 1294 (1998), *reinstated by* 166 F.3d 1332, 1336 (11th

Cir. 1999) (*en banc).*  Accordingly, the court FINDS that all FLSA claims *other than* the FLSA

retaliation claim are due to be DISMISSED as abandoned, and the court will proceed to address

the remaining FLSA retaliation issue.

To establish a *prima facie* case of retaliation under the FLSA, a plaintiff must show that

"(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse

action by the employer; and (3) a causal connection existed between the employee's activity and

the adverse action."  *Wolf v. Coca-Cola Co.,* 200 F.3d 1337, 1342-43 (11th Cir. 2000) (quoting

*Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208-09 (10th Cir. 1997)). "In demonstrating causation,

the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion

of FLSA rights." *Wolf,* 200 F. 3d at 1343.  If the plaintiff meets her *prima facie* case, then the

employer, in turn, must assert a legitimate reason for the adverse action, and the plaintiff  may

thereafter attempt to show pretext.  *Id.* at 1342.

In the instant case, Foy must first establish the existence of protected activity under the

FLSA. Her brief refers to her August 16, 2011 letter to the EEOC.  Because the August 16 letter

is dated *after* her firing, that letter itself cannot represent protected activity.  However, both the letter and Foy's brief also refer to the email exchange between Foy and Donalson that pre-dated the firing and  in which Foy complained about inadequate pay.  Unfortunately, Foy's statement of facts do not quote the content of these emails nor do they refer the court to the exhibit number of the emails in the evidentiary submissions; Foy's statement of facts does refer the court to the August 16 post-termination letter referring to those emails, but that letter is not the best evidence of the emails' actual contents.   Therefore, attempting to connect the dots because the parties have not done so, the court has searched the evidence submitted to determine if indeed the emails are included.  The court found them in the recently supplemented evidence –  the previously omitted exhibits to Foy's deposition.  *See* Supplemental Evid. Mat. Doc. 65 & 66.

Among those emails is one dated July 19, 2010, in which Foy stated, among other matters: "Also, since you pay me $195.00 a week for service work on a 35-40 hr work week, please reflect my hourly rate to change from $13.00 an hour to $6.00 for 35 hrs of week. [T]his still equal [sic] $195.00 a week." (Doc. 65-1). The court accepts that email as protected activity under the FLSA; Foy complained about working a full work week and only getting paid $6.00 per hour, less than minimum wage.

In her August 16, 2011 post-termination letter, Foy refers to a more recent email exchange discussing pay.  Her June 16, 2011 email to Donalson reads:

> Pat,
>
> On 6-1 I requested my paycheck for the May 15th and June 1 and you said you thought you had paid me for May 15th....but you had not.  I have attached copies of the two check [sic] you paid me for on May 7th......as you can see from your printout at the bottom its dated May 6th.....(I was paid March 31st and April 29th...... May 15th should have been paid on or

> after May 15th.....thats [sic] why on June 1st I requested the 15th and June 1st check....
>
> Now on June 8th our [sic] paid me for June 1st.....check.....
>
> I am request [sic] BOTH checks May 15th and June 15th....
>
> Pat should I be paid through payroll?

(Doc. 65-1, at 51).  In a responsive email the next day, Donalson says in relevant part: "I'll be glad to send your payments through the pay service.  They wanted to do that in the beginning, but you did not."  *Id.*

While this June 2011 email exchange certainly includes Foy's complaint about pay-related issues, she is complaining about not getting paid *promptly* and *regularly* and appears to request that she be paid through payroll. In that email, Foy does not specifically complain about the hourly rate of her wages or the failure to be compensated for overtime work or mis-classification as a salaried instead of an hourly worker.

In her deposition testimony, Foy discussed the reasons for her termination and a conversation she had with Donalson relating to the June 2011 email exchange:

> Q.  When you received your commissions check, did you request that that be run or did that not be run through a payroll service?
> A.  No.
> Q.  I know you put that in your complaint.  Did you have some discussions with Pat about that?
> A.  At a later point in time I told Pat that – as a matter of fact, that's what resulted in my termination.
> Q.  What was the specific conversation you guys had?
> A.  I asked Pat to pay me through payroll so – one of the reasons because she wasn't paying me on time, she wasn't paying into my Social Security, she wasn't paying into my Medicare.  So I learned that later on rather than sooner that that was working against me, not for her to pay, but she didn't give me an option.
> ***
> Q.  Did y'all have any conversations other than those emails?

> A.  We would have had a lot of conversations, you know, verbal.
> Q.  Specifically anything about that particular request?
> A.  About —
> Q.  To get paid six dollars per hour for thirty-five hours per week?
> A.  Not that I can recall.

(Pl.'s Dep. at 64-65, & 86 - Exhibit E)

In her brief, Foy seems to assume that *any* pay-related complaints are protected activity under the FLSA, and, thus, that the June 2011 email exchange and related conversation about pay fall under protected activity.  However, she does not point the court to any provisions of the FLSA and/or case law that support that broad interpretation, and the court is unaware of any.  Defendants' reply brief asserts that these complaints are *not* directed at FLSA violations.  The court agrees and finds that the June 2011 email exchange *and* related discussion between Donalson and Foy about late payment are not protected activities under the FLSA.

If the June 2011 email exchange is not protected activity, then the only protected activity to which Foy has directed the court from October 2008[3] forward  is the June 2010 email exchange, more than a year before her termination.  With respect to causation, Foy has the burden of showing that she would not have be fired *but for* her assertion of rights under the FLSA.  *See Wolf*, 200 F.3d at 1343.  To satisfy this burden, a plaintiff can prove a "close temporal proximity" between the time her employer learned about her protected activity and the date of her termination.  *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007).  "But mere temporal proximity, without more, must be 'very close.'" *Id.* (*quoting Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal citations omitted)).  Even a three-to-

---

[3] Generally, any claim for violations of the FLSA is governed by a two-year statute of limitation.  The statute of limitations for willful violations of the FLSA is three years.  29 U.S.C. § 255.  Foy filed the instant suit in October of 2011.

four month disparity between the statutorily protected conduct and the adverse employment action is not enough. *Thomas*, 506 F.3d at 1364. Therefore, in the instant case, the 2010 protected conduct is far too remote in time to establish causation based on mere temporal proximity. Foy offered nothing more that is material, relevant, and proper evidence. The court FINDS that Foy has not established her *prima facie* case on the FLSA retaliation claim. Therefore, the court will GRANT the Donalson Defendants' motion for summary judgment as that claim and  ENTER SUMMARY JUDGMENT in favor of the Pat Donalson Agency on it; the FLSA retaliation claim is asserted against the Agency but not against Pat Donalson herself.

### 3.  Outrage

The Donalson Defendants also request that the court grant summary judgment in their favor on one of the claims brought under Alabama law: the tort of outrage claim. To prevail on a claim for outrage under Alabama law, a plaintiff must prove "(1) that the defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct; (2) that the defendants' conduct was extreme and outrageous; and (3) that the defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Woodruff v. City of Tuscaloosa,* 101 So. 3d 749, 755 (Ala. 2012). "By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." *Ex parte Bole,* 103 So. 3d 40, 53 (Ala. 2012) (citing the standard in the *Restatement (Second) of Torts § 46* (1948) approved in *American Road Serv. Co. v. Inmon,* 394 So. 2d 361, 365 (Ala. 1980)).

As the Supreme Court of Alabama explained in *Bole,*

> [t]he tort of outrage is an extremely limited cause of action.  It is so
> limited that this Court has recognized it in regard to only three kinds of
> conduct: (1) wrongful conduct in the family-burial context, *Whitt v.
> Hulsey,* 519 So. 2d 01 (Ala. 1987); (2) barbaric methods employed to
> coerce an insurance settlement, *National Sec. Fire & Cas. Co. v.
> Bowen,* 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual
> harassment, *Busby v. Truswal Sys. Corp.,* 551 So. 2d 322 (Ala. 1989).
> *See also* Michael L. Roberts and Gregory S. Cusimano, *Alabama Tort
> Law,* § 23.0 (2d ed. 1996).

*Bole*, 103 So. 3d at 52-53 (quoting *Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000)).  More

recently, the Supreme Court affirmed a judgment in an outrage claim against a family physician

who, as he counseled a teenaged boy whose parents were going through a divorce, "began

exchanging addictive prescription drugs for homosexual sex [with his teenaged patient] ...

resulting in the boy's drug addiction."  *Bole,* 103 So. 3d at 53 (describing the facts of and ruling in

*O'Rear v. B.H.,* 69 So. 3d 106 (Ala. 2011).

Hitting employees and grabbing them by the arm, as Foy has alleged that Donalson did in

the instant case, is not acceptable conduct.  However, the court finds that conduct and the other

conduct alleged in the instant case does not meet the high standard set out above; the Donalson

Defendants' conduct is not analogous to the narrow categories of cases, such as the fact situations

noted above where the defendants' conduct was so extreme and outrageous that it went beyond all

bounds of decency. Therefore, the court finds that the motion for summary judgment is due to be

GRANTED in favor of the Donalson Defendants as to the tort of outrage claim; the court will

ENTER SUMMARY JUDGMENT in favor the Donalson Defendants and against Foy as to that

claim.

## V.  CONCLUSION

In sum, for the reasons stated above, the court FINDS as follows:

**Claims against Nationwide**

•       As to the FLSA claims and *employment discrimination* claims  brought pursuant to §1981, Nationwide's motion for summary judgment is due to be GRANTED and SUMMARY JUDGMENT ENTERED in favor of Nationwide and against Foy, because Nationwide is not Foy's employer or joint employer.

•       As to the *non-employment discrimination* claims brought pursuant to § 1981, Nationwide's motion for summary judgment is due to be GRANTED in favor of Nationwide and against Foy.

As no further claims exist against Nationwide, the court will ENTER SUMMARY JUDGMENT in favor of Nationwide as to all claims and DISMISS it WITH PREJUDICE as a party Defendant.

**Claims against the Donalson Defendants**

•       As to the claim for disparate pay based on race asserted against the Pat Donalson Agency, the Donalson Defendants' motion for summary judgment is due to be DENIED.

•       As to the claim for discriminatory discharge based on race asserted against the Pat Donalson Agency, the Donalson Defendants' motion for summary judgment is due to be GRANTED; the court will ENTER SUMMARY JUDGMENT  in favor of the Pat Donalson Agency and against Foy on this claim.

•       As to the claim for racially hostile work environment asserted against the Pat Donalson Agency,  the Donalson Defendants' motion for summary judgment is due to be

44

GRANTED; the court will ENTER SUMMARY JUDGMENT in favor of the Pat

Donalson Agency and against Foy on this claim.

•      As to the FLSA retaliation claim asserted against the Pat Donalson Agency, the Donalson

Defendants' motion for summary judgment is due to be GRANTED; the court will

ENTER SUMMARY JUDGMENT in favor of the Pat Donalson Agency and against Foy

on this claim.

•      As to other FLSA claims, if any, asserted in the Complaint, the court FINDS that Foy has

abandoned them, and those claims, if any, are due to be DISMISSED WITH PREJUDICE.

•      As to the tort of outrage claim asserted against both Donalson Defendants, the Donalson

Defendants' motion for summary judgment is due to be GRANTED; the court will

ENTER SUMMARY JUDGMENT in favor of the Donalson Defendants and against Foy

on this claim.

The court notes that the Donalson Defendants' motion was one for *partial* summary

judgment; it did not address Foy's other claims for assault and battery brought under state law.

Accordingly, this case will proceed to trial on the following claims Foy brought against the

Donalson Defendants:  disparate pay based on race, brought pursuant to § 1981 against the Pat

Donalson Agency; the assault claim brought under state law and asserted against the Pat Donalson

Agency and Pat Donalson; and the battery claim brought under state law and asserted against the

Pat Donalson Agency and Pat Donalson.

Dated this 22nd day of May, 2013.

_____

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

45